**Barry HACKNER, Plaintiff–Appellant,**

v.

**LONG TERM DISABILITY PLAN FOR EMPLOYEES OF THE HAVI GROUP LP, Defendant–Appellee.**

No. 03–1037.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 2003.

Decided Nov. 17, 2003.

Rehearing Denied Dec. 5, 2003.

Mark D. DeBofsky, David A. Bryant, Daley, DeBofsky & Bryant, Chicago, IL, for Plaintiff–Appellant.

Donald A. Murday, Chittenden, Murday & Novotny, Chicago, IL, for Defendant–Appellee.

Before ROVNER, EVANS, and WILLIAMS, Circuit Judges.

## ORDER

Barry Hackner sued his long term disability plan ("the Plan") and its insurer to have his disability benefits reinstated. The district court granted the insurer's motion to dismiss, finding that it was not a proper party to the action, and granted summary judgment to the Plan by finding that the insurer's decision to terminate benefits was not arbitrary and capricious. The district court also held that the insurer was entitled to reimbursement from Hackner for the Social Security benefits he and his child received and that the insurer's calculations for such reimbursements were correct. Because we find that the insurer acted arbitrarily and capriciously in terminating Hackner's disability benefits, we reverse the judgment of the district court with respect to this issue and order his benefits reinstated. We affirm the other decisions of the district court.

## I. BACKGROUND

Barry Hackner worked for The Havi Group LP as a manager of technical support for personal computer installations until December 1996. He was a participant in an ERISA-governed benefit plan ("the Plan") purchased by Havi from Hartford Life & Accident Insurance Company.

Under the terms of the Plan, Havi is the named Plan Administrator and Hartford is the benefits payor, but the Plan grants Hartford the discretionary authority to make benefits determinations. The Plan's policy for long term disability benefits provides that such benefits shall start six months after the commencement of the total disability. Under the Plan, disability means "any accidental bodily injury, sickness or pregnancy." The Plan informs employees that they will be considered "Totally Disabled" under the following circumstances:

(a) during the Elimination Period; and

(b) for the next 24 months;

you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education or experience.

In addition, the Plan provides that disability benefits for mental illness are available for a total of twenty-four months over the course of the person's lifetime.

The Plan states that disability payments will be made until "(1) the date you are no longer Disabled; [or] (2) the date you fail to furnish proof that you are continuously Disabled." Furthermore, "Hartford reserves the right to determine if Proof of Loss is satisfactory." Lastly, the Plan contains a reimbursement provision which states that the benefits paid for by the Plan shall be offset by "the amount of disability or retirement benefits under the United States Social Security Act to which you may be entitled because of disability or retirement," and "if Family Social Security is included in your Plan of Insurance, the amount of disability or retirement benefits under the United States Social Secu-

rity Act to which your spouse and children may be entitled because of your disability or retirement."

In September 1996, Hackner filed for disability benefits due to depression. In March 1997, Hartford found that Hackner had become "Totally Disabled" due to depression and coronary artery disease, and began paying Hackner monthly disability benefits. Hackner underwent surgery on his right shoulder in November 1997, and in March 1999, Hartford concluded that he was still "Totally Disabled" and, though he had exhausted his twenty-four-month "mental illness" disability coverage, continued paying him disability benefits. In August 1999, Hartford informed Hackner that, in accordance with the terms of the policy, in order to continue receiving benefits he must be prevented by disability from doing *any* occupation or work for which he was or could be qualified by training, education, or experience, not just that he could not perform his own occupation in which he was employed at the time of commencement of the disability benefits.

Also in August 1999, Hackner began receiving Social Security disability benefits. In October 1999, because of these benefits, Hartford informed Hackner that it had overpaid him $22,865.06, and Hackner reimbursed Hartford for this amount. In May 2000, after Hackner notified Hartford of additional Social Security benefits that he and his son had received due to the reopening of an earlier application for benefits, Hartford demanded that Hackner repay an additional $26,232.56. Hackner paid $18,732.56 in July 2000, leaving a balance of $7,500 (though Hartford only seeks $6,500).

Hackner underwent a second operation on his right shoulder in December 1999, and Hartford decided to extend his disability coverage into 2000 because of the sur-

gery. Shortly thereafter, Hackner was examined by Dr. Grober, a rheumatologist, who reported to Hartford that Hackner was diagnosed with right shoulder impingement syndrome and rotator cuff tendonitis. Because Hackner was reported not to have any active use of his right arm in lifting, carrying, pushing, pulling, driving and repetitive hand motions, Hartford extended his disability benefits until April 2000.

In February 2000, Hackner was examined by Dr. Hudgins, a physical medicine specialist, who reported to Harford that Hackner continued to suffer impairments in both shoulders and lower back pain. His report stated that Hackner did not suffer discomfort when sitting and that Hackner felt better when sitting and leaning forward. The report also indicated that Hackner had multiple complaints of pain in his right shoulder and low back, chronic discomfort and that standing for 15–20 minutes exacerbated discomfort. Dr. Hudgins recommended physical therapy necessary to increase flexibility in Hackner's shoulders and lower back. A month later, Dr. Hudgins examined Hackner again and found that he was unable to tolerate the exercise program prescribed by his physical therapist. That same month, the physical therapist diagnosed Hackner with "mechanical lower back pain and status post depression." In April 2000, Hackner underwent an MRI which revealed degenerative changes in the lumbar spine, including bulging discs.

On April 13, 2000, Hartford notified Hackner that after review of his claim, it "determined that [he] remain[ed] Totally Disabled as defined by the policy." Hackner also was informed that benefits would continue so long as he remained "Totally Disabled as defined by the policy and

me[t] other policy requirements," but not beyond February 11, 2008. In late July 2000, in a further attempt to return to work, Hackner asked Hartford to reimburse him for the cost of office equipment, a new mattress, health club membership, various job-related memberships, research materials, web design courses, and a $700 ergonomic chair.

Hartford contacted Dr. Hudgins, Hackner's physical medicine specialist, to inquire about Hackner's ability to perform sedentary work. Dr. Hudgins apparently informed Hartford that when he had examined Hackner six months earlier (in February 2000), he thought Hackner definitely could perform sedentary jobs. Also in August 2000, Hackner's orthopedist, Dr. Palutis, examined Hackner and found him to be diffusely tender in both shoulders. In response to Hartford's inquiry, he deferred to Dr. Hudgins's conclusions regarding Hackner's capacity to return to work. In September 2000, Hartford contacted Dr. Jaffe, Hackner's internist, who had seen Hackner earlier that month and who felt that Hackner was physically capable of sedentary work, but that his psychiatric impairments largely limited his ability to work. After receiving this information, Hartford reviewed Hackner's past employment history and determined that Hackner could perform a variety of sedentary, non-physical jobs: user support analyst, market research analyst, consultant, research and development director, or Vice President (any industry). Hartford concluded that the medical evidence did not support Hackner's claim that he was "Totally Disabled" from *any occupation* due to his physical condition because Hackner could perform several sedentary occupations. Therefore, on October 19, 2000, Hartford notified Hackner of the termination of his long-term benefits.

Hackner appealed the termination of benefits to Hartford. In an appeal on March 23, 2001, Hackner submitted a written report from Dr. Blonsky, a doctor retained by Hackner to assist his appeal. Dr. Blonsky evaluated Hackner, obtained his medical history, and reviewed his medical documentation. He reported to Hartford that Hackner had "ongoing chronic pain in both shoulders as well as recent onset of bilateral knee problems," and that "[Hackner's] complaints of pain appear to be credible. It is my opinion that these physical changes are sufficient to justify continuing disability." Hackner also submitted the April 2000 lumbar MRI that revealed degenerative changes and bulging discs.

At the request of the insurer, Hartford's Associate Medical Director, Dr. Kazda, reviewed Hackner's claim file but did not personally examine Hackner. On May 8, 2001, Dr. Kazda concluded that even with the new information, "Mr. Hackner retains the physical functioning capacity to engage in [a sedentary] occupation." On May 22, 2001, Hartford upheld its termination, noting in part that Hackner had performed a consulting business from his home and attended twenty-two seminars related to his business. Hackner appealed a second time by providing a report from his psychiatrist and copies of all documentation relating to his claim. In October 2001, Dr. Kazda again reviewed the information and, again without evaluating Hackner, reaffirmed his previous findings. Hartford upheld its earlier decision. Hackner appealed a third time, and Hartford once again denied his appeal. Hartford noted that Hackner did not complain of knee and hip problems until after his benefits were terminated, and in February 2000 had reported no difficulty with sitting but actually indicated he felt better when sitting and leaning forward.

Hackner sued the Plan and Hartford for reinstatement of his disability benefits. The district court granted Hartford's motion to dismiss, finding that it was not a proper party to the action. The court also determined that Hartford's decision to terminate benefits was not arbitrary or capricious, and therefore granted summary judgment to the Plan on Hackner's claim for reinstatement of benefits. The district court further held that Hartford was entitled to reimbursement from Hackner for the Social Security benefits he and his child had received, and that Hartford's calculation of its overpayment was correct. Hackner appeals.

## II. ANALYSIS

### A. Hartford Is Not A Proper Party

 Section 1132(d)(2) of ERISA expressly provides that "[a]ny money judgment ... against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person." 29 U.S.C. § 1132(d)(2). Accordingly, this circuit has held that ERISA suits generally may only be brought against the Plan itself. *See Garratt v. Knowles,* 245 F.3d 941, 949 (7th Cir.2001); *Riordan v. Commonwealth Edison Co.,* 128 F.3d 549, 551 (7th Cir.1997); *Jass v. Prudential Health Care Plan, Inc.,* 88 F.3d 1482, 1490 (7th Cir.1996); *but see Neuma, Inc. v. AMP, Inc.,* 259 F.3d 864, 872 n. 4 (7th Cir.2001) (allowing lawsuit against employer when it was the plan administrator and closely intertwined with the plan). Hackner sued the Plan and Hartford, but his complaint does not allege that Hartford is the Plan Administrator, and the district court explicitly found Havi to be designated as the Plan Administrator. Because Hartford is neither the Plan nor the Plan Administrator, it cannot be held liable under ERISA, and therefore is

not a proper party to this lawsuit.[1]

## B. The Termination of Benefits

■ This court reviews a district court's decision to grant a motion for summary judgment de novo, construing all facts and drawing all reasonable inferences in favor of the non-moving party. *Trustees of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 772–73 (7th Cir.2002). A plan administrator's denial of benefits is reviewed de novo, but if the Plan gives the plan administrator discretionary authority to determine eligibility for benefits, we review the decision under the arbitrary and capricious standard. *Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir.2003) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Here, the Plan provides that Hartford "has full discretion and authority to determine the eligibility for benefits and to construe and interpret all terms of the policy." Since no magic words are necessary to grant discretion, we agree with the district court that the Plan granted Hartford discretionary authority and, therefore, the appropriate scope of review is the arbitrary and capricious standard. *See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1019 (7th Cir.1998).

Under the arbitrary and capricious standard, the function of this court is to decide whether the decision was "completely unreasonable," and in reaching our conclusion, we are not bound by the authority relied on by the Plan. *Id.* at 1021. This court recognizes that the arbitrary and capricious standard is an extremely deferential form of judicial review, however, this court will not rubber stamp a plan administrator's decisions. *Cozzie*, 140 F.3d at 1107–08. We will not "uphold a termination when there is an absence of reasoning in the record to support it." *See, e.g., Hackett*, 315 F.3d at 774–75.

In April 2000, Hartford concluded, after a review of Hackner's claim, that Hackner remained "Totally Disabled as defined by the policy." In July 2000, in his attempt to rehabilitate himself and return to work, Hackner asked for financial assistance from Hartford. He requested reimbursement for the cost of office equipment, a new mattress, health club membership, various job-related memberships, research materials, web design courses and a $700 ergonomic chair. In August 2000, Hartford responded by contacting Dr. Hudgins, Dr. Jaffe, and Dr. Palutis regarding Hackner's ability to perform sedentary jobs. Dr. Hudgins indicated his belief that six months earlier Hackner could have performed sedentary work, despite his previous written report which supported Hartford's conclusion that Hackner was "Totally Disabled." Dr. Jaffe, Hackner's family doctor, did not treat Hackner's orthopedic and neurologic impairments, but indicated that he thought Hackner was physically capable of sedentary work, but that his psychiatric impairments largely limited his ability to work. Hackner's orthopedist, Dr. Palutis, exam-

---

**1.** Hackner argues that Hartford is a *de facto* Plan Administrator under *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002). In a footnote in *Moran*, the Court acknowledged that no party challenged the HMO's status as a defendant, despite the fact that many courts interpret ERISA to permit suits only against plans, plan administrators or fiduciaries. *Id.* at 363

n. 3. The Court in *Moran* did not hold the defendant HMO to be a *de facto* plan administrator because of the discretion the Plan granted to the HMO, but took that discretion to be one among a number of variables. Regardless, the Court avoided addressing the issue of whether an HMO could be a party defendant in an ERISA claim as its status was "immaterial" to the holding. *Id.*

ined Hackner in August 2000 and found him to be diffusely tender in both shoulders, but indicated he would defer to Dr. Hudgins's conclusions regarding Hackner's capacity to return to work.

There is no indication in the record that Hacker's condition was any better in August 2000 than it had been in February 2000. Indeed, between meeting with Dr. Hudgins in February, and Hartford's decision to terminate benefits in August, Hackner had a follow-up visit with Dr. Hudgins in which Dr. Hudgins stopped the physical therapy he had recommended a month earlier because of the severity of Hackner's pain. Furthermore, an April 2000 MRI revealed significant abnormalities not previously noted.[2] Nevertheless, Hartford determined Hackner could perform sedentary work and was not "Totally Disabled," and it terminated his disability benefits. Notably, no independent medical examination or functional capacity evaluation was sought by Hartford before terminating Hackner's benefits or during the appeal process. Instead, during the appeal process, Hartford had its own medical director, Dr. Kazda, review Hackner's file and, without examining Hackner, he agreed with Hartford's previous finding that Hackner is capable of performing certain sedentary jobs.

Under these circumstances, we cannot uphold Hartford's determination that Hackner was no longer "Totally Disabled" under the Plan because it believed he was capable of performing sedentary jobs. Not only was this decision based on information that was not current, it was made without a comprehensive examination of Hackner by a specialist, was in the face of contradictory MRI evidence, and was rubber-stamped by Hartford's medical di-

rector during the appeal process. In addition, it apparently was triggered by Hackner's request for financial assistance to help him rehabilitate in an effort to return to work, and occurred shortly after Hartford's own finding of "Total Disability" under the Plan.

Having concluded that the denial of Hackner's benefits was reached in an arbitrary and capricious manner, the proper remedy is to retroactively reinstate benefits. *See Hackett,* 315 F.3d at 775–77. Moreover, Hackner is entitled to recover pre-judgment interest on the amount improperly withheld. *See May Dep't Stores Co. v. Fed. Ins. Co.,* 305 F.3d 597, 603 (7th Cir.2002); *Clair v. Harris Trust & Sav. Bank,* 190 F.3d 495, 498 (7th Cir.1999). We note, however, that while we must reverse the Plan's decision to terminate Hackner's disability benefits because Hartford's decision was arbitrary and capricious, nothing prevents Hartford from reviewing Hackner's claim in the future.

## C. Hartford's Calculation of Overpayments

■ Hackner claims that Social Security benefits paid to his son are not deductible from his benefits. The Plan provides, however, that Social Security disability benefits paid to Hackner and his "children" count against his disability benefits under the Plan. In support of his position, Hackner cites to *In re Unisys Corp. Long–Term Disability Plan ERISA Litigation,* 97 F.3d 710, 716 (3d Cir.1996), and *Decker v. Combined Insurance Company of America,* 244 Neb. 281, 505 N.W.2d 719, 724 (Neb.1993). Those cases are inapposite as the Plans in those cases covered payments to "dependents," whereas the

---

**2.** The objective findings of the MRI were later confirmed by another MRI performed in December 2000.

provision in Hackner's Plan clearly covers payments to "children." [3] Because the Plan provides that Social Security benefits paid to Hackner's "children" due to his disability count against his benefits from the Plan, the district court was correct that Hartford was entitled to be reimbursed the additional $6,500 it seeks with respect to the Social Security benefits Hackner's son received as a result of Hackner's disability. [4]

**D. Attorney's Fees**

■ Section 1132(g) of ERISA provides that, in an action brought by a participant or a beneficiary, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). While there is a "modest presumption" that prevailing parties are entitled to a reasonable attorney's fees, this presumption is rebuttable. *Bowerman v. Wal–Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir.2000) (holding that in order for the attorney's fees to be awarded a five factor test must be satisfied and fees are not awarded when the plan is "substantially justified" in its determination). This court reviews a district court's award of attorney's fees for an abuse of discretion, *id.*, but the district court did not address this remedy because it entered summary judgment in the Plan's favor rather than Hackner's. Therefore, on remand, the district court should consider in the first instance whether Hackner is enti-

tled to attorney's fees and, if so, what amount represents reasonable fees.

**III. CONCLUSION**

The judgment of the district court is REVERSED in part and AFFIRMED in part. The case is REMANDED for further proceedings consistent with this Order.

---

3. Hackner states that his son is not his legal dependent as he lives with Hackner's ex-wife and Hackner does not and cannot claim him as a dependent on his income tax returns.

4. Hackner claims that Hartford's calculation is incorrect because Hartford double-counted some of the Social Security benefits he received. Hackner, however, misrepresents when the payments were received and what periods they covered. Hackner received approximately $24,000 in Social Security dis-

ability benefits in August 1999, and those benefits covered the period March 1998 to August 1999. He reimbursed Hartford the $22,865 it requested with respect to these benefits. Later, he and his son received $26,232.56 in benefits for the period March 1997 to March 1998. Hackner reimbursed Hartford only $18,732.56 of the second overpayment. Therefore, there is an overpayment balance of $7,500, of which Hartford seeks only $6,500.