# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-1995

DONALD J. TOMPKINS,

*Plaintiff/Counter-Defendant-Appellant,*

*v.*

CENTRAL LABORERS' PENSION FUND,

*Defendant/Counter-Plaintiff-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 4:09-cv-004004—**Sara Darrow**, *Judge*.

ARGUED OCTOBER 31, 2012—DECIDED MARCH 13, 2013

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and
SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge*. The Central Laborers' Pension
Fund (the "Fund") terminated Donald J. Tompkins's
disability benefits because he became employed
full-time and, therefore, no longer had a "total and per-
manent disability." Tompkins, who brought this action

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., challenges the Fund's interpretation of its definition of "total and permanent disability." The Fund, which acknowledges that the relevant definition provision is ambiguous, argues that its interpretation is entitled to deference under the arbitrary-and-capricious standard of review. We agree. Despite Tompkins's arguments to the contrary, the Fund based its decision to terminate his benefits on a reasonable interpretation of the definition provision. And because none of Tompkins's remaining arguments challenging that decision has merit, we affirm the district court's decision granting summary judgment in the Fund's favor.

## I. BACKGROUND

Tompkins, who began working as a laborer in Illinois in 1978, is a participant in the Fund, a not-for-profit, multi-employer pension fund established and administered pursuant to ERISA. In July 1999, Tompkins filed an application for a disability pension from the Fund based on chronic asthmatic bronchitis, which he attributed to working with cement dust for twenty-two years. At that time the Fund was administered pursuant to the Summary Plan Description, Revised and Effective July 1, 1995 ("Revised SPD") and the Restated Plan Rules and Regulations-Amended and Restated Effective October 1, 1994 ("First Restated Plan"). The Fund did not mail or otherwise provide the First Restated Plan to Tompkins or any other Fund participants, but Tompkins

did receive a copy of the Revised SPD, which provided in relevant part that "[d]isability benefits are payable for life, assuming, of course, that you remain totally and permanently disabled." The Revised SPD also referred participants to the provisions of the First Restated Plan, which defined "total and permanent disability" and explained when the Fund could terminate or suspend benefits.

Amendment 7 to the First Restated Plan, which became effective in November 1998, included the following provision:

> A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the trustees, considers the disability to be total and permanent, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes

of Section 3.10. Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.

The Fund did not provide Amendment 7 to Tompkins or any other plan participant.

Tompkins's application for a disability pension included an acknowledgment that he agreed to be bound by all the Fund's rules and regulations, although he did not inquire about those rules or make any effort to find out what they were at the time he applied or before filing this lawsuit. In August 1999, the Fund approved Tompkins for "total and permanent disability" benefits in the amount of $2,115.43 per month, retroactive to January 1, 1999. The first time Tompkins received his monthly benefit, he was required to sign a Retirement Declaration that provided notice of disqualifying employment for plan participants receiving retirement pensions but did not include the rules and regulations specific to disability pensioners.

Tompkins received monthly disability benefits through May 2007. In June, the Fund sent him a letter suspending his disability pension, claiming that his full-time employment at Wilman Construction in 2005 and 2006 led the Fund "to believe that [he] no longer [met] the Fund's definition of 'total and permanent disability.'" The Fund found that Tompkins began working forty hours per week beginning in July 2005 and earned

$10,550 that year and $22,100 in 2006. The letter informed Tompkins that he had been overpaid $48,654.89 in benefits from July 2005 through May 2007 and that the Fund would seek to recover that amount through its recovery process.

The Fund based its decision to terminate Tompkins's disability benefits on Section 3.10's definition of "total and permanent disability." Tompkins, who disputed the Fund's interpretation of the definition, appealed the Fund's decision. He made three arguments. First, he asserted that his 2005 work did not violate Section 3.10 because the work was "non-laborer" employment that earned him less than $14,000. He also argued that the overpayment provisions should only apply once he earned $14,000 for the year. And finally, he asserted that he was not notified of the requirement to remain "totally and permanently disabled" to continue receiving disability benefits.

After the Fund unanimously denied his appeal in 2008, Tompkins filed a complaint in federal court. In an amended complaint, he alleged: the Fund controverted the plain meaning of the Plan by failing to apply the $14,000 provision to his full-time employment as a non-laborer; the Fund breached its fiduciary duty by failing to provide him with proper notice of the rules governing suspension of his benefits; and the Fund violated ERISA's anti-cutback rule. The Fund filed a counterclaim for fraudulent concealment, alleging that Tompkins hid his full-time employment between 2005 and 2007. Both parties filed motions for summary judg-

ment. The district court granted the Fund's motion on all of Tompkins's claims and held a two-day bench trial on the Fund's counterclaim. After finding that there was no evidence that Tompkins intended to deceive the Fund into paying him benefits, the court ruled in favor of Tompkins on the Fund's counterclaim. Tompkins appeals the district court's summary judgment decisions on his claims that the Fund controverted the plain meaning of Section 3.10 and breached its fiduciary duty.

## II. ANALYSIS

We review a district court's summary judgment decisions de novo. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011). When we consider a district court decision following cross-motions for summary judgment, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

### A.  The Arbitrary-and-Capricious Standard Applies

A district court reviews the denial of ERISA benefits de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the terms of a plan provide for such discretion, judicial review of the administrator's decision

is limited to an arbitrary-and-capricious standard, under which an administrator's decision will be upheld "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456 (7th Cir. 2004) (internal quotation omitted).

The parties agree that the Plan grants the Fund's trustees discretionary authority to interpret and apply its terms. Tompkins, however, relies on recent language from the Supreme Court to argue that the arbitrary-and-capricious standard of review should not apply. In *Conkright v. Frommert*, the Court stated that "[u]nder trust law, a trustee may be stripped of deference when he does not exercise his discretion honestly and fairly." 130 S. Ct. 1640, 1651 (2010) (internal quotation marks omitted).

Tompkins first suggests that a heightened standard of review is warranted under *Conkright* because the Fund acted in bad faith by failing to disclose three documents to him: an internal memo sent in 1997 from one of the Fund's consultants to an attorney stating that the general consensus was that the definition of "total and permanent disability" was too restrictive; a 1997 letter sent from the same consultant to an attorney describing an amendment to the plan that would allow a disabled person to earn up to $14,000 in non-construc-

tion work and continue to be eligible for disability benefits; and a proposed—but not adopted—2005 draft amendment to the plan that considered incorporating language that Tompkins argues would have only been necessary if his interpretation of the $14,000 provision were accurate. Tompkins alleges that because these documents support his view that the $14,000 provision applied to part-time *and full-time* work in non-laborer employment, the Fund acted in bad faith by not disclosing them to him prior to or during his April 2008 appeal hearing.

Tompkins's bad-faith argument is meritless. After its adverse benefit termination, the Fund was required to provide Tompkins with copies of "documents, records, and other information relevant to [his] claim for benefits." 29 C.F.R. § 2560.503-1(j)(3). And information is "relevant" if it: "(i) [w]as relied upon in making the benefit determination; (ii) [w]as submitted, considered, or generated in the course of making the benefit determination . . .; (iii) [d]emonstrates compliance with the administrative processes and safeguards required . . . in making the benefit determination; or (iv) [i]n the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit . . . ." *Id.* § 2560.503.1(m)(8). Tompkins does not argue that any of the documents he identifies were relevant under any of these bases of relevance. Rather, he asserts that they were available to the trustees at the time they denied his benefits, and, collectively, they show that the Fund acted in bad faith. But

we will not characterize the Fund as acting in bad faith because it did not disclose documents it had no obligation to disclose.

Tompkins next attempts to convince us that the Fund is not entitled to the arbitrary-and-capricious standard of review because a conflict of interest influenced its decision to terminate his disability benefits. "[A] benefits determination by a plan administrator is a fiduciary act, one in which the administrator owes a special duty of loyalty to the plan beneficiaries." *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1081-82 (7th Cir. 2012). And "if a plan gives discretionary authority to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed . . . ." *Id.* at 1082. We held that a conflicts analysis was not necessary when the plan at issue was a multi-employer welfare plan whose trustees consisted of an equal number of union and employer representatives, whose union representatives had "no discernible incentive to rule against an applicant," and whose trustees were unanimous in their ruling. *Manny v. Cent. States, Se. and Sw. Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 243 (7th Cir. 2004). Tompkins argues that a conflicts analysis is required here because the trustees, who ruled unanimously and who are split evenly among union and employer representatives, had an incentive to rule against him, as evidenced by the fact that they evaluated his claims at the same time they were concerned about the cost of the retirement plan. Tompkins's evidence of a conflict of interest is minimal at best—a 2004 presentation emailed by the Fund's con-

sultant to its executive director that included a recommendation that the Fund "ensure all disability pensioners are disabled" and a 2010 letter to participants and beneficiaries giving notice that the decline in financial markets put the fund in "endangered status" for the 2009 plan year.

We have previously held that "the arbitrary-and-capricious standard may be a range, not a point" and that "[t]here may be in effect a sliding scale of judicial review of trustees' decisions—more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Van Boxel v. Journal Co. Emps. Pension Trust*, 836 F.2d 1048, 1052-53 (7th Cir. 1987). The suspicion of partiality raised by Tompkins's claim is negligible, in part because his evidence either predated the termination decision by four years or did not exist until nearly two years after it. Furthermore, there is no reason to suspect from that evidence—or any other evidence presented by Tompkins—that the Fund was motivated to improperly administer disability pensions around the time it made the decision to terminate his benefits. Tompkins's arguments are simply not sufficient to change the applicable standard of review. The range of the arbitrary-and-capricious standard leaves us more than enough room to take Tompkins's concerns into account while still granting the Fund's trustees the appropriate amount of deference.

On appeal, Tompkins argues that the district court should have addressed the conflict-of-interest issue before responding to his claims that the Fund was acting

in bad faith. This argument fails for several reasons. First, Tompkins did not argue for a particular sequence of review to the district court, and at summary judgment, he presented his bad-faith argument before his conflict-of-interest one. Additionally, he provides no authority for his argument that the district court should have considered the alleged conflict of interest first. Instead, he merely cites language stating that "a majority of the Supreme Court Justices consider the potential conflict of interest of a plan administrator (or its staff) serious enough to be given weight in judicial review of the denial of benefits." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir. 2009). But *Marrs* does nothing to advance Tompkins's cause, since it does not address the order in which a district court must consider arguments relevant to the selection of a standard of review. And ultimately, the order makes no difference. Tompkins's evidence of bad faith and conflict of interest is insufficient to raise suspicions about the trustees' actions that warrant raising the applicable standard of review, regardless of which challenge we consider first.

## B.  The Fund Did Not Act in an Arbitrary or Capricious Manner

The parties dispute the relevance of the phrase "[f]or such" in this excerpt from Section 3.10 (emphasis added):

> A Total and Permanent Disability shall mean that the Employee is totally and permanently. . . unable to engage in further employment or gainful

> pursuit of non-Laborer . . . employment for which the employment is considered full-time and a primary source of income. *For such* non-Laborer . . . employment, . . . the Participant may earn up to $14,000 per calendar year in non-Laborer . . . employment and be considered totally and permanently disabled . . . .

Under Tompkins's reading of this provision, the "for such" prefatory phrase, which allows pensioners to earn up to $14,000 through non-laborer employment, refers to all the language that precedes it (i.e., "non-Laborer employment for which the employment is considered full-time and a primary source of income"), such that a person employed full-time can remain "totally and permanently disabled" if he earns less than $14,000. In contrast, the Fund interprets the "for such" language as a general reference to the type of work allowed in the $14,000 provision such that a participant can earn up to $14,000 through non-laborer employment and remain "totally and permanently disabled," but he cannot do so if he is employed as a laborer. According to the Fund, the $14,000 provision does not address the length of time the pensioner works; instead, it argues that the first sentence of Section 3.10 accomplishes this by prohibiting a "totally and permanently disabled" participant from engaging in full-time non-laborer employment. According to the Fund, it intended the $14,000 provision to allow permanently disabled participants to maintain part-time employment without losing their disability pensions.

Tompkins asks us to find the meaning of the $14,000 provision so plain that the Fund acted arbitrarily and capriciously when it relied on it to terminate his benefits. *See Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) ("In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious."). The Fund responds that the language in the $14,000 provision is ambiguous. We agree. There are certainly more efficient ways to communicate the Fund's definition of "total and permanent disability." And the "for such" preface seems unnecessarily confusing. In addition, Tompkins's need to resort to extrinsic evidence, such as the 1997 memo and letter and the 2005 draft amendment, also suggests that the provision is, in fact, ambiguous. *See Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 541 (7th Cir. 1996) (with ERISA plans, "[e]xtrinsic evidence should not be used where the contract is unambiguous" (quoting *GCIU Emp'r Ret. Fund v. Chi. Tribune Co.*, 66 F.3d 862, 865 (7th Cir. 1995)). Because of that ambiguity, the Fund's interpretation of the $14,000 provision is entitled to deference. That interpretation rests on a reasoned understanding of "total and permanent disability": once a participant is engaged in full-time employment, regardless of how much he makes, he is no longer totally and permanently disabled. Given the required level of deference to the Fund's interpretation of its own plan, we cannot say the Fund acted arbitrarily or capriciously when it denied Tompkins benefits for the time he was employed full-time.

### C.  The Fund Did Not Breach Its Fiduciary Duty

Breaches of fiduciary duty occur when fiduciaries "mislead plan participants or misrepresent the terms or administration of a plan." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993). However, "while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004). Rather, there must have been an intent to "disadvantage or deceive" plan participants. *Vallone*, 375 F.3d at 642.

ERISA requires trustees to discharge their duties "in accordance with the documents and instruments governing the plan . . . ." (the "plan document rule"). 29 U.S.C. § 1104(a)(1)(D). Tompkins argues that the Fund breached this duty by not providing him with the Plan Rules Governing Suspension, a document he argues set limits on his subsequent employment. Although the Plan acknowledges its failure to provide Tompkins with this document, Tompkins's argument nonetheless fails because the Plan Rules Governing Suspension does not apply to disability benefits; rather, it details the suspension of regular pension benefits, as evidenced by its prohibition on pensioners receiving "any type of compensation" and the ability of pensioners to begin receiving benefits again after terminating disqualifying employment. It would not be logical for these provisions to apply to someone who is *totally* and *permanently* disabled. And given the deference that courts must give funds interpreting their own plan documents, it was not

arbitrary or capricious for the Fund to fail to give Tompkins a document that it believed did not apply to him.

Tompkins also argues that the Fund breached its fiduciary duties of care, skill, prudence, and diligence by providing him with incorrect or insufficient notice of the terms of his disability benefits, pointing specifically to the Retirement Declaration that was not tailored to disability beneficiaries. Assuming that the Fund provided inaccurate information to Tompkins by giving him the Retirement Declaration rather than one tailored to disability pensioners, there is no evidence of intent to deceive or disadvantage him. First, it was the Fund's standard practice to provide that declaration to disability pensioners. And more importantly, the requirement that disability pensioners like Tompkins remain "totally and permanently disabled" was set out elsewhere, including in the Revised SPD, which Tompkins received.

Finally, Tompkins suggests that the Fund breached its duty by not suspending his benefits in January 2004, when it discovered that he had earned $7,144.00 in 2001 and $4,037.50 in 2002. This argument is meritless. When the Fund asked Tompkins to explain the nature of his 2001 and 2002 work, he responded that he worked eight to ten hours a week repairing nail guns and performing light office duties. This work was neither full-time nor connected to more than $14,000 in compensation, so it would not have triggered the termination of benefits under either interpretation of the

$14,000 provision. Thus, the Fund's failure to terminate his benefits was not a breach of its fiduciary duty.

### III.  CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.