In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1900

BASIL A. FRYE,

*Plaintiff-Appellee,*

*v.*

THOMPSON STEEL COMPANY,
INCORPORATED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
1:09-cv-00977—**Jeffrey N. Cole**, *Magistrate Judge*.

ARGUED JANUARY 13, 2011—DECIDED SEPTEMBER 2, 2011

Before RIPPLE, EVANS[*] and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Basil Frye brought this ERISA[1]
action in the United States District Court for the Northern

---

[*] Circuit Judge Evans died on August 10, 2011, and did not
participate in the decision of this case, which is being resolved
by a quorum of the panel under 28 U.S.C. § 46(d).

[1] Employee Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001 *et seq.*

District of Illinois against his former employer, Thompson Steel Company. Mr. Frye sought review of a denial of pension benefits by the Thompson Steel Retirement Committee ("the Committee"), which administers a company-sponsored retirement plan. The Committee had determined that the plan required it to offset against his pension the amount Mr. Frye previously had received from Thompson Steel in settlement of two Illinois workers' compensation permanent partial disability claims. On cross-motions for summary judgment on the administrative record, the district court held that the Committee had misread the plain language of the plan and that the offset therefore was arbitrary and capricious. Accordingly, the district court granted summary judgment in favor of Mr. Frye and remanded the matter to the Committee for a new determination. Thompson Steel now appeals.

We conclude that the decision of the Committee was not arbitrary and capricious. The Committee's determination that the offset provision is applicable has rational support in the plan's terms. Accordingly, we reverse the judgment of the district court and remand the case with directions that the court grant summary judgment for Thompson Steel.

# I

# BACKGROUND

## A. Facts

In 2007, Mr. Frye, a longtime employee at Thompson Steel and a member of the United Steelworkers of America,

Local 7773, retired when Thompson Steel's Franklin Park, Illinois steel plant, at which he had worked for forty-two years, was shut down. At the time of the shutdown, he had the choice of being laid off or of taking early retirement. He chose the latter.

Thompson Steel and Mr. Frye's union had negotiated the terms of the benefit plan. Under its terms, Mr. Frye's pension payment, without any offset, was $688.13 a month. The Committee notified him, however, that payment of his pension would be deferred for eight years and two months. According to the Committee, the terms of the benefit plan required that, before the pension payments could start, Mr. Frye had to pay back the total amount of payments from workers' compensation settlements that he had received after sustaining two on-the-job injuries in 2005 and 2006. The Committee later recalculated the amount due and increased the offset period to about ten years and two months. *See* R.30-3 at 2 (AR0002).[2]

**1.**

We now turn to a detailed examination of the payments that are the basis of the claimed deduction from Mr. Frye's retirement pension. During his employment

---

[2] Citations to documents in the administrative record will contain a citation to the district court record followed by a parallel citation to the administrative record page number (AR) in parentheses.

at Thompson Steel, Mr. Frye suffered two workplace injuries, one to his right arm in 2005 and one to his left leg almost exactly one year later. After his arm injury, Mr. Frye missed twelve weeks of work and received $6,893.16—or $574.43 per week—in "temporary total disability benefits" for lost wages. *Id.* at 15 (AR0072). After his leg injury, he missed no work and did not receive any temporary disability benefits. He continued to work for another year until the plant closed.

Mr. Frye also received workers' compensation settlement awards for permanent partial disabilities of $48,597.06 for his arm injury and $35,291.50 for his leg injury from Thompson Steel. The total award amount was $83,888.56. After the subtraction of attorney's fees, the cost of obtaining medical reports and the cost of making copies of exhibits and reports, Mr. Frye actually received $75,622.09. *See id.* at 16, 18 (AR0073, AR0075).

The Illinois Workers' Compensation Commission ("IWCC") calculated the amount of Mr. Frye's settlement awards in the following manner. The Illinois Workers' Compensation Act, 820 ILCS 305, contains a schedule that sets a certain number of weeks' compensation for the loss of a body part or the loss of use of a body part, called a "permanent partial disability" ("PPD").[3] For example, at the time Mr. Frye was injured, the loss of an arm or the full loss of the use of an arm was set at 235 weeks PPD, and the loss of a leg at 215 weeks PPD.

---

[3] *See* 27 Donald Ramsell, *Illinois Practice, Illinois Workers' Compensation Law* § 18:1 (2009).

*See* 820 ILCS 305/8(e)(10), (12). Because Mr. Frye lost only part of the use of his limbs, the number of weeks was multiplied by the percentage of lost use. IWCC determined that Mr. Frye had lost 40% of the use of his right arm and 35% of the use of his left leg; after multiplication, this resulted in 94 weeks for the arm and 75.25 weeks for the leg. R.30-3 at 16, 18 (AR0073, AR0075). Therefore, IWCC determined the total settlement amount by multiplying the number of weeks PPD by a statutorily fixed percentage, 60%, of Mr. Frye's average weekly wage for the year preceding the injury.[4] The settlement agreements recite that, given Mr. Frye's life expectancy of 16.8 years from the date of settlement, the settlement amount would compensate Mr. Frye for the equivalent of $86.56 per week for the rest of his life. *See id.* The award did not include medical expenses, which also were paid by Thompson Steel.

**2.**

We now examine the deduction of these settlement amounts for permanent partial disability from Mr. Frye's pension. To ensure a comprehensive understanding, we describe the key provisions of the retirement plan that are pertinent to this matter.

---

[4] For example, in the year preceding the injury to his arm, Mr. Frye's average weekly wage was $861.65, 60% of which is $516.99. $516.99 multiplied by 94 (weeks PPD) equals $48,597.06, the settlement amount for the arm injury. *See* R.30-3 at 15-16 (AR0072-73).

The pension offset is based on section 4.8 of the re-
tirement plan. That section provides:

> Any amount paid to or on behalf of any Employee
> or Pensioner on account of injury or occupational
> disease causing *disability in the nature of a permanent*
> *disability* for which the Company is liable . . .
> pursuant to Workers' Compensation . . . shall be
> deducted from or charged against any regular
> pension payable under this Plan[.]

R.30-5 at 72-73 (AR00221-22) (emphasis added). The
Committee determined that this provision applies to
Mr. Frye's permanent partial disability awards and that
Thompson Steel is entitled to recoup the $83,888.56 by
withholding Mr. Frye's pension payments in the full
amount of $688.13 a month until the awards are paid
back. Under this determination, the Committee will not
begin paying Mr. Frye any portion of his pension for 121.9
months, or approximately ten years and two months,
from the date of his retirement.

Mr. Frye challenged this determination before the
Committee. He contended that a definition of "disability"
contained elsewhere in the plan constrains the Com-
mittee's discretion to interpret the offset provision as
applicable to his injuries. Specifically, section 3.4 of the
plan defines "disability" and "disabled" as

> *totally disabled* by bodily injury or disease so as to
> be *prevented thereby from engaging in any occupation*
> *or employment* for remuneration or profit[,] . . .
> [which disability] shall have continued for a
> period of six consecutive months and, in the opin-

> ion of a qualified physician, . . . will be permanent
> and continuous during the remainder of his life.

*Id.* at 67 (AR00216) (emphasis added). Mr. Frye took the view that this definition does not include his injuries because he continued to work for two years after the first injury until he retired and, presumably, still could work today.

In its letter denying Mr. Frye's challenge, the Committee maintained that it "has consistently interpreted and applied this definition only to determine eligibility for a Disability Retirement and not to determine the applicability of an offset for 'permanent disability' under Section 4.8." R.30-3 at 22 (AR0079). Instead, "[t]he characterization of monies received on account of 'permanent disability' under Section 4.8 is a function of the payment, itself, not an unrelated eligibility definition under the Plan," and because IWCC characterized Mr. Frye's settlement as a "permanent partial disability," the plan "mandates the offset" to Mr. Frye's pension. *Id.* Mr. Frye filed an appeal with the Committee, which also was denied. The Committee's decision on appeal provided the following elaboration of its earlier reasoning:

> The reference to "permanent disability" in Schedule C, Article 4.8 refers to the legal characterization of the payment received by the employee, not the plan's definition of "permanent disability" for pension eligibility purposes. In Mr. Frye's case, the Illinois Workers Compensation Commission characterized the benefits he received as payments in respect of his "permanent disability."

Accordingly, those payments were properly deducted from his pension benefit pursuant to Schedule C, Article 4.8. The Committee's denial of Mr. Frye's claim is consistent with its previous interpretation and application of Schedule C, Article 4.8 to awards for permanent partial disability under the Illinois Workers' Compensation Act.

*Id.* at 28 (AR0085).

## B.  Proceedings Before the District Court

Mr. Frye then filed this action against Thompson Steel in the district court under section 502 of ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). This provision permits a plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* After both parties moved for summary judgment on the administrative record, the district court granted judgment in favor of Mr. Frye and remanded to the Committee for a new determination.

According to the district court, the Committee's deduction of benefits was arbitrary and capricious because it ignored the plain language of section 3.4 of the plan. The court agreed with Mr. Frye that this section defines "disability" not as a function of IWCC's characterization of the payment, but as being "*totally disabled* by bodily injury or disease so as to be *prevented thereby from engaging in any occupation or employment* for remunera-

tion or profit." R.30-5 at 67 (AR00216) (emphasis added); *see* R.53 at 5-7.

The district court explained that, without this defini- tion, interpreting the offset provision of section 4.8 to require deductions from Mr. Frye's pension because a "permanent partial disability" is "in the nature of a permanent disability" would have been reasonable, which usually is all that is required for a plan admin- istrator's interpretation to survive review. *See* R.53 at 4. Yet here, the specific definition provided in section 3.4, and made applicable to the offset provision in section 4.8 by section 1.9, controlled. It would be unreasonable, held the court, to employ a new definition for a term already defined in the plan. Instead, what the Committee should have done—and would have to do on remand—is to determine whether Mr. Frye received payments on account of an injury that met the requirements for a disability as set out in section 3.4 or that was in the nature of such a disability.

## II

## DISCUSSION

### A.

The parties agree that, because the plan vests in the Committee the discretion to interpret the plan's terms and to determine eligibility for benefits, we, like the district court, must review the Committee's determination deferentially, "asking only whether the . . . decision was arbitrary or capricious." *Hess v. Reg-Ellen Mach. Tool*

*Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007).

Under arbitrary-or-capricious review, we look to "whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)). This last requirement—absence of reasoning—has been stated in various formulations.[5] The

---

[5] *See, e.g., Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (holding that an administrator's "failure to address [key] evidence in its determination surely constitutes an absence of reasoning"); *Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009) (stating that a court may "reject the administrator's interpretation only if it is unreasonable (arbitrary and capricious)" (internal quotation marks omitted)); *Fischer v. Liberty Life Assurance Co.*, 576 F.3d 369, 376 (7th Cir. 2009) ("We will not uphold a termination of benefits if there is no support in the record for the ultimate decision."); *id.* at 377 (affirming an administrator's decision because "the evidence permitted it"); *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007) (insisting that courts will not overturn an administrator's decision unless "it is 'downright unreasonable'" (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir. 1998))); *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004) ("The committee

(continued...)

semantical variations no doubt reflect the different situations in which fiduciaries must make determinations affecting eligibility. These situations vary significantly. For instance, a fiduciary may be required in one case to assess the quality and quantity of evidence submitted by a beneficiary to support a claim; in another, the task may be to determine whether the submitted evidence can be characterized as fulfilling a particular requirement of the plan. Here, the Committee was faced with a question of plan interpretation.

As a general rule, "federal common law principles of contract interpretation govern" the interpretation of ERISA plans. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996). In this context, we have said that the fiduciary, in interpreting the plan, is not free, by virtue of its discretion, "to disregard unambiguous language in the plan." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009); *Swaback*, 103 F.3d at 540. On the other hand, the fiduciary's "use of interpretive tools to disambiguate ambiguous language is . . . entitled to deferential consideration by a reviewing court." *Marrs*, 577 F.3d at 786 (emphasis omitted). In using such tools, the fiduciary may not, of course, rewrite or modify the plan. *See Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001,

---

[5] (...continued)

must articulate a rational connection between the facts found, the issue to be decided, and the choice made."); *Ross v. Indiana State Teacher's Ass'n Ins. Trust,* 159 F.3d 1001, 1011 (7th Cir. 1998) (upholding decision because the administrator's "approach was reasonable in light of the plan language").

1011 (7th Cir. 1998). "Interpretation and modification are different; the power to do the first does not imply the power to do the second." *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1108 (7th Cir. 1998). Rather, the fiduciary must reach an interpretation compatible with the language and the structure of the plan document. Of course, "it is not our function to decide whether we would reach the same conclusion as the administrator." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005) (internal quotation marks omitted).

**B.**

We begin our analysis by examining thoroughly the text of the sections of the plan that are pertinent to the inquiry.

At the time relevant to this action, Thompson Steel had several plants throughout the United States. Before 2003, the company negotiated and entered into separate benefit plan agreements with the local unions repre-senting workers at each plant. In 1997, Thompson Steel entered into a Supplemental Agreement Covering Pensions ("the Supplemental Agreement") with Local Union No. 7773, the union that represented workers at the now-interred Franklin Park Plant where Mr. Frye worked. Thompson Steel then merged the Supplemental Agree-ment into its Retirement Plan for Salaried Employees of Thompson Steel Company, Inc. ("the Master Plan"), *see* R.30-4 at 36 (AR00107), which includes special provi-

sions applicable to particular plants.[6] Schedule C to the Master Plan governs workers at the Franklin Park Plant.[7]

Section 1 of Schedule C covers definitions and provides that these definitions apply throughout Schedule C. R.30-5 at 63 (AR00212) ("For purposes of this Schedule C, terms defined in section 1.3 of the Plan shall have the meanings assigned therein, and the following terms shall have the meanings specified below."). One such defined term is "disability." According to section 1.9, the terms "'Permanently incapacitated', 'permanent incapacity' and 'disability' shall have the meanings stated in section 3.4." *Id.* at 64 (AR00213) (emphasis added).

Section 3.4, titled "Disability Retirement," sets out the terms upon which an employee who has been permanently incapacitated may retire early. It defines "permanently incapacitated" as follows:

> An Employee shall be deemed to be permanently incapacitated (as the term "permanently incapacitated" is used herein) and shall be retired only (i) if he has been totally disabled by bodily injury or disease so as to be prevented thereby from

---

[6] *See* R.30-4 at 39 (AR00110) (listing Exhibit B: Boston Plan; Exhibit C: Worcester Plan; Exhibit D: Randolph Plan; Schedule A: Merger Roseville Plan; Schedule C: Merger Local Union 7773 Plan; and Schedule D: Merger Local Union 5211-01 Plan).

[7] The Master Plan was amended and restated effective January 1, 2007, but Schedule C was not altered by these amendments.

engaging in any occupation or employment for remuneration or profit and (ii) if such total disability shall have continued for a period of six consecutive months and, in the opinion of a qualified physician, it will be permanent and continuous during the remainder of his life.

*Id.* at 67 (AR00216). Section 3.4 also provides that, "[a]s used herein, the terms 'disability' and 'disabled' shall have the same meanings as the phrases 'permanent incapacity' or 'permanently incapacitated', respectively." *Id.*

Finally, section 4.8, entitled "Deduction for Disability Payments," provides:

Any amount paid to or on behalf of any Employee or Pensioner on account of injury or occupational disease causing *disability in the nature of a permanent disability* for which the Company is liable . . . pursuant to Workers' Compensation . . . shall be deducted from or charged against any regular pension payable under this Plan[.]

*Id.* at 72-73 (AR00221-22) (emphasis added). This section continues:

provided, however, there shall not be deducted from any regular pension payable prior to age sixty-five (65) because of eligibility arising under section 3.4 any payments which shall be received by the Pensioner under Workers' Compensation or Occupational Disease laws for any disability in the nature of a permanent disability.

*Id.* at 73 (AR00222).

**C.**

Keeping firmly in mind the applicable standards governing the authority of the Committee, we now turn to an examination of the decision of the Committee with respect to these provisions and the review of that decision by the district court.

The Committee determined that Mr. Frye's permanent partial disability workers' compensation payments were subject to the offset provision of section 4.8 of the benefit plan. In its view, the payments he received for his permanent partial disabilities were received on account of disabilities "in the nature of a permanent disability." R.53 at 4. As the district court noted, when section 4.8 is read alone, there is nothing irrational about calling a permanent partial disability a "disability in the nature of a permanent disability" and basing an offset provision on "the legal characterization," R.30-3 at 28 (AR0085), made by a state workers' compensation commission.

The district court believed, however, that there was one major infirmity in accepting this construction of the benefit plan. Employing the definition of disability in section 3.4, which is made applicable throughout Schedule C by section 1.9, "disability" as used anywhere in Schedule C must mean "permanent incapacity," which in turn must mean an injury rendering an employee "totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit" and which, in the opinion of a physician, "will be permanent and con-

tinuous during the remainder of [the Employee's] life." R.30-5 at 67 (AR00216). Under this reasoning, held the court, Mr. Frye's payments for *partial* disabilities could not be offset against the retirement plan payments.

Yet, as Thompson Steel observes, importing this definition from section 3.4 into the offset provision in section 4.8 of Schedule C poses an interpretative ambiguity because of section 4.8's double use of "disability." *See id.* at 72 (AR00221). If the definition from section 1.9 applies to *both* uses of disability in section 3.4, then the relevant portion of the operative sentence would read something along the lines of "a total and permanent bodily disability preventing further employment in the nature of a total and permanent bodily disability preventing further employment," which is circular.

Alternatively, of course, the section 3.4 definition may not have been intended to apply to the offset provision at all, but it inadvertently was made applicable to the offset provision when the drafters overlooked the roundabout effect of section 1.9.

A review of the rest of the plan does not shed any definitive light on the ambiguity. Neither the language nor the structure of Schedule C or of the Master Plan as a whole can solve conclusively the interpretative difficulties posed by the offset provision. Were we sifting through the pieces independently, we *might* have concluded that Mr. Frye's interpretation should carry the day. However, reconciling the conflicting provisions of the plan by dealing with the difficulties posed by its language is precisely the task entrusted to a plan adminis-

trator vested with interpretative discretion by the plan document.

To be sure, "[d]eferential review is not no review; deference need not be abject. Sometimes the structure of the plan or sheer common sense or inconsistent interpretations will provide the court with a handle for pronouncing the administrator's determination arbitrary and capricious." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996). Here, however, the plan contains a real ambiguity that the Committee had to face and resolve. The offset provision, when read in relation to the remainder of the plan, is sufficiently ambiguous that its meaning cannot be ascertained from its plain language or from the structure of the document. Resolving how the terms relate to one another calls for a detailed interpretative process, and ERISA permits that process to be entrusted to the Committee. *See Comrie v. IPSCO, Inc.*, 636 F.3d 839, 843 (7th Cir. 2011).

The Committee's resolution of this ambiguity was not arbitrary or capricious. To prevail, Mr. Frye had to demonstrate that there was no "rational support in the record," *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (quotation marks omitted), for the Committee's determination that the offset provision applies to his workers' compensation partial disability payments. He did not carry this burden. Although Mr. Frye's alternate interpretation was also reasonable, the Committee adopted a reasonable construction of the phrase "disability in the nature of a permanent disability," considered Mr. Frye's contention regarding the definition of "disabil-

ity" in section 3.4 and communicated a rational explanation for its decision. The phrase "in the nature of" suggests a broad and somewhat fluid concept of qualifying disabilities that lends itself quite naturally to payments for injuries denoted permanent partial disabilities by the workers' compensation statute. It also could be indicative of the drafters' intent to widen the scope of the offset provision to include disabilities that are like permanent disabilities but are not permanent in the strictest sense. The specific mention of workers' compensation payments in section 4.8 provides further rational support for the Committee's decision to base the offset on IWCC's characterization of the injury. Moreover, there is no evidence that the Committee has applied the plan provisions inconsistently or that it manufactured its interpretation for the occasion. Therefore, the Committee's decision fell within the bounds of its discretion.

The district court's decision granting summary judgment in favor of Mr. Frye must be reversed. Because it is clear that Mr. Frye cannot prevail as a matter of law, Thompson Steel is entitled on remand to a grant of summary judgment in its favor. *See Swaback*, 103 F.3d at 544 (stating that, "in instances in which the facts and law establish that the appellant is entitled to judgment as a matter of law, we are free to direct the district court to enter judgment in appellant's favor").

## Conclusion

The judgment of the district court is reversed and the case is remanded with instructions to grant summary

judgment in favor of Thompson Steel. Thompson Steel may recover its costs in this court.

REVERSED and REMANDED
with INSTRUCTIONS