# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2624

BARBARA BECKER, personal
representative of the ESTATE
OF EVELYN JERANEK, deceased,

*Plaintiff-Appellant*,

*v.*

CHRYSLER LLC HEALTH CARE
BENEFITS PLAN, an ERISA
collectively bargained single
employer welfare benefit plan,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:09-cv-00344-WCG—**William C. Griesbach**, *Judge*.

ARGUED DECEMBER 2, 2011—DECIDED AUGUST 20, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and
FEINERMAN, *District Judge*.[*]

_____

[*] The Honorable Gary S. Feinerman of the Northern District
of Illinois, sitting by designation.

RIPPLE, *Circuit Judge.*  Before her death, Evelyn Jeranek was a resident at the Nu-Roc Nursing Home ("Nu-Roc") for the better part of two years. Barbara Becker, Ms. Jeranek's daughter and the personal representative of her estate, initiated this action in state court against the Chrysler LLC Health Care Benefits Plan (the "Plan") after Humana, the Plan's third-party administrator, denied coverage for Ms. Jeranek's stay at Nu-Roc.[1] The defendant removed the action to the United States District Court for the Eastern District of Wisconsin, and, in due course, the parties filed cross-motions for summary judgment. The district court determined that Humana's denial of coverage was not arbitrary and capricious and accordingly granted summary judgment for the Plan. Ms. Becker timely appealed.[2] We agree with the district court and therefore affirm its judgment.

# I

## BACKGROUND

### A.

Ms. Jeranek, a beneficiary of the Plan by virtue of her husband's long-time employment at, and retirement from, American Motors Corporation, was hospitalized on November 12, 2006. Three days later, she was admitted at Nu-Roc. She was eighty-eight years old and suffered

---

[1] The district court's jurisdiction is predicated on 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

[2] Our jurisdiction is predicated on 28 U.S.C. § 1291.

from a variety of maladies[3] that required her to use fourteen prescription medications. A physician estimated at the time of her admission that Ms. Jeranek had a life expectancy of about one year. A note entered on her medical record at the time recited: "Stay: long term[. R]ehab potential is poor."[4] Indeed, Ms. Becker stated in a filing before the district court: "It is undisputed Evelyn Jeranek did not need to be in a hospital[;] however she could no longer be cared for at home because she could not ambulate. After eight years, Barbara Becker no longer could take care of her mother at home."[5]

Ms. Jeranek was a resident at Nu-Roc for a total of 702 days. On several occasions during her time there, Ms. Jeranek refused medical care for certain ailments.[6] Similarly, less than a year after being admitted to Nu-Roc, Ms. Jeranek declined her physician's recommendation

---

[3] Ms. Jeranek was afflicted by end-stage congestive heart failure, type 2 diabetes, reflux, anxiety, neuropathy, an aortic valve problem, syncope, hyperlipidemia, renal insufficiency and a hormone issue.

[4] A.R. at 2776.

[5] R.46 at 11 (citations omitted).

[6] A.R. at 2727 (noting that Ms. Jeranek declined her physician's recommendation for an enucleation of one eye on December 20, 2006); *id.* at 2722 (noting that Ms. Jeranek declined her physician's recommendation for "scoping of the stomach and the colon" on July 11, 2007); *id.* at 2721 (noting that Ms. Jeranek declined her physician's recommendation to see a dermatologist on August 29, 2007).

that she be hospitalized to evaluate and treat symptoms, including swelling, that indicated a "significant change in her cardiac status."[7] Her medical records indicate that her doctor understood Ms. Jeranek to be "on comfort measures only" at least as of November 14, 2007.[8] In her time at Nu-Roc, Ms. Jeranek received twenty-six medical visits, sixty-three doctor's change orders and frequent attention from nursing staff.[9] She died on October 22, 2008.

---

[7] *Id.* at 2733 (noting, in a medical record dated September 20, 2007, that Ms. Jeranek and Ms. Becker did not "want to pursue" treatment, including hospitalization); *see also id.* at 2719 (stating, in a medical record dated October 10, 2007, that both Ms. Jeranek and her daughter "do not want any hospitalization," despite the physician's advice that hospitalization "would be the most effective thing to do" to treat her swelling).

[8] *Id.* at 2718; *see also id.* at 2713 (noting, in a medical record dated August 6, 2008, that Ms. Jeranek "has now been put on comfort measures" and, "at this point, . . . we are just doing comfort measures and prognosis is certainly poor"); *id.* at 2712 (noting, in a medical record dated September 3, 2008, that Ms. Jeranek "is at a comfort only measure" and, "[a]gain, we are trying to keep this woman comfortable"); *id.* at 2711 (similar notation on a September 17, 2008 medical record).

[9] Ms. Jeranek's list of medications remained substantially the same throughout her stay at Nu-Roc. *Id.* at 2724 (noting, in a medical record dated March 7, 2007, that Ms. Jeranek's "medications are unchanged"); *id.* at 2715 (noting, in a medical record dated May 7, 2008, that Ms. Jeranek's "meds currently are totally unchanged from what they had been all along"); *id.* at 2714 (similar notation in a medical record dated July 9, 2008).

**B.**

From November 15, 2006, until November 19, 2006, Ms. Jeranek's stay at Nu-Roc was paid for by Medicare. Humana originally authorized and paid a total of $50,097.67 to Nu-Roc for services provided from November 20, 2006, to September 30, 2007 ("Phase One"). However, Humana later determined that its disbursement to Nu-Roc had been a mistake. It characterized Ms. Jeranek's treatment at Nu-Roc as "custodial" care, determined that such care was not covered by the Plan and sought reimbursement for its previous payments.[10] Humana also denied coverage for Ms. Jeranek's stay at Nu-Roc for the period between October 1, 2007, and October 22, 2008 ("Phase Two"). During Phase Two, the costs for Ms. Jeranek's care totaled $64,669.74.

In early 2009, Ms. Becker administratively appealed the denial of coverage for Ms. Jeranek's Phase Two care. Humana sent Ms. Jeranek's medical file to Advanced Medical Reviews for an independent review, which was conducted by Dr. James Wood. After referring to several resources, including the *Milliman Care Guidelines*, Dr. Wood concluded that Ms. Jeranek had received only custodial care at Nu-Roc during both Phase One and Two. He found "no documentation that [Ms. Jeranek] had needs that required skilled nursing care on any of the dates between 11/20/06-10/23/08. . . . Care on all dates

---

[10] Counsel for the Plan informed us that Humana is unsure of who, if anyone, approved the initial payment to Nu-Roc, noting that there is no documentation of the approval.

in question would be considered custodial in nature."[11] Humana denied Ms. Becker's appeal.

In October 2009, Ms. Becker appealed Humana's determination that it should not have paid for Ms. Jeranek's Phase One care.[12] Dr. Wood, this time working through the Physician's Review Network, again reviewed Ms. Jeranek's medical records and again referred to the *Milliman Care Guidelines* and other sources. Dr. Wood determined that "the services rendered to [Ms. Jeranek] from 10/20/06[13] to 10/23/08 do not meet the *Milliman* criteria for skilled nursing care and instead would be considered custodial care and therefore not covered under the terms of the [Summary Plan Description]."[14] Humana denied the appeal.

In February 2010, Ms. Becker appealed both of these denials. Dr. Wood, working through the Physician's Review Network, again reviewed Ms. Jeranek's medical records. After consulting the *Milliman Care Guidelines*

[11] *Id.* at 714.

[12] The parties' briefs disagree about whether this appeal was relevant to Phase One or to Phase Two. Ms. Becker's brief states that the appeal related to Phase Two, Appellant's Br. 9, while the Plan states that it related to Phase One, Appellee's Br. 11. Although the appeal itself does not use the terminology we have adopted, it is limited clearly to Phase One. A.R. at 863-64.

[13] This appears to be a typographical error on the physician's report, as the relevant period begins November 20, 2006, rather than October 20, 2006.

[14] A.R. at 1583 (italicization added).

and another resource, Dr. Wood concluded that "the services rendered to [Ms. Jeranek from] 10/20/06[15] to 10/23/08 do not meet the *Milliman* criteria for skilled nursing care. . . . The documentation indicates that [Ms. Jeranek's] care is largely custodial in nature and that her needs could be met safely and effectively in a custodial care facility."[16]

In April 2010, Ms. Becker submitted additional documentation and requested another review. Two physicians working through Advanced Medical Reviews, Dr. Alan Menkes and Dr. John Zarcone, reviewed Ms. Jeranek's medical records. After referring to the *Milliman Care Guidelines*, Drs. Menkes and Zarcone determined that Ms. Jeranek "had a chronic, stable condition not requiring skilled nursing."[17] Humana ultimately denied Ms. Becker's appeal, noting that the reviewing physicians found that:

> [n]one of the skilled nursing services outlined in the plan document ([i.e.,] IV or IM injections, TPN, enteral feeds, nasopharyngeal and tracheotomy aspiration, insertion and irrigation with replacement of suprapub[]ic catheters, colostomy care, treatment of Stage III or worse decubitis ulcers[], initial phase of bronchodilator therapy)

---

[15] As before, this appears to be a typographical error.

[16] *Id.* at 2822-23 (italicization added).

[17] *Id.* at 3587-88.

were provided on any of the dates in question.[18]

In June 2010, Ms. Becker requested reconsideration of the denial of her February appeal. Dr. James Regan, working through AllMed, reviewed the relevant records and concluded that "[t]he care is domiciliary or custodial under the language of the plan."[19] Further, Dr. Regan noted:

> Because of the inexorable progression of her disease, [Ms. Jeranek] was no longer capable of managing herself in the home setting, but the nature of her care, predicated upon comfort measures, did not require the [skilled nursing facility] level of care. The patient's care was largely palliative in nature, and such care is common in the long-term care environment . . . . The long-term care setting would have been appropriate and safe for this patient, and she did not require the [skilled nursing facility] level of service.[20]

Humana denied the request for reconsideration.

---

[18] *Id.* at 3600 (internal quotation marks omitted). These examples are not enumerated in the Plan itself, but, as Ms. Becker pointed out in the district court, they are listed in the *Milliman Care Guidelines*. R.45 at 24.

[19] A.R. at 4770. Notably, Dr. Regan is the only doctor who reviewed Ms. Jeranek's medical records without consulting the *Milliman Care Guidelines*. He referred instead to a Palliative Care publication by the Institute for Clinical Systems Improvement. *Id.* at 4771.

[20] *Id.* at 4771.

In August 2010, Ms. Becker requested a second reconsideration of the earlier denial. Humana denied the request without ordering another independent physician review of Ms. Jeranek's medical records.

After her administrative appeals and requests for reconsideration were unsuccessful, Ms. Becker initiated this litigation by filing a complaint in state court. The Plan removed the case to the district court.

## C.

In an amended complaint filed in the district court, Ms. Becker challenged Humana's determination that Ms. Jeranek's care at Nu-Roc was not covered by the Plan.[21] The defendant filed an answer denying liability. In due course, both Ms. Becker and the Plan filed motions

---

[21] Specifically, Ms. Becker presented six claims: (1) Coverage was mandated by a collective bargaining agreement, which governs the Plan and the Summary Plan Description (the "SPD"); (2) the SPD did not conform to the Plan because it did not discuss long-term illness benefits, violating 29 U.S.C. § 1022(a)(1); (3) Humana's definition of "definitive" in the phrase "definitive skilled nursing care" was illusory and improper; (4) Ms. Jeranek suffered from a specific condition, cardio-circulatory disease, that required skilled nursing care, therefore Humana's conclusion that she received only custodial or domiciliary care was erroneous; (5) Humana administered Ms. Jeranek's claims in an arbitrary and capricious fashion; and (6) Humana should not have denied Ms. Jeranek's claim for benefits. R.25 at 13-25.

for summary judgment. Although the motions raised a variety of issues and allegations,[22] the district court sifted through the contentions and determined that the parties' dispute was "whether the *type* of care [Ms.] Jeranek received was covered by the Plan."[23] The defendant contended that Ms. Jeranek received only uncovered custodial care, while Ms. Becker asserted that, "[s]ince prolonging Evelyn Jeranek's life constituted a medical necessity[,] the burden of proof shifted to the Plan to prove" both that the custodial care exception applied

---

[22] For example, in support of her motion for summary judgment, Ms. Becker made the following arguments, restated and summarized here: (1) Because the SPD is silent on the issue of terminal illness benefits, Humana erred by relying on the SPD to define the limits of those benefits; (2) Humana erred by not using the common and ordinary definitions of "continuing" and "skilled nursing services"; (3) Nu-Roc is a "skilled nursing facility" for purposes of the Plan; (4) Ms. Jeranek received continuing skilled nursing services at Nu-Roc, and Humana's reliance on the *Milliman Care Guidelines* to determine otherwise was unreasonable; (5) Ms. Jeranek received "definitive" nursing care as evidenced by her living beyond her estimated life expectancy; (6) Humana should not have denied Ms. Jeranek's claim because there was no stand-alone domiciliary or custodial care exception in the "skilled nursing care" section of the Plan; (7) Ms. Jeranek would have suffered transfer trauma if she had been moved from Nu-Roc to the closest custodial facility, which was over 100 miles away; and (8) Humana's denial of coverage was improper because Ms. Jeranek was terminally ill. R.40 at 3-31.

[23] R.49 at 1 (emphasis in original).

and that the care Ms. Jeranek received at Nu-Roc was not covered.[24]

The district court concluded that Humana reasonably had interpreted the Plan and that the record fully supported a finding that Ms. Jeranek received only uncovered custodial or domiciliary care at Nu-Roc.[25] Accordingly, the district court denied Ms. Becker's motion for summary judgment and granted summary judgment in favor of the Plan.

Ms. Becker timely appealed.

## II

## DISCUSSION

### A.

We review a district court's grant of summary judgment de novo. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011). Because Humana, as the administrator of the Plan, was vested with discretionary authority to interpret the Plan's provisions and to determine eligibility for and entitlement to Plan benefits,[26] "we will only look to ensure that [Humana's] decision

---

[24] R.40 at 23.

[25] The district court also addressed directly Ms. Becker's other arguments, but concluded that they were meritless or extraneous. R.49 at 9-13.

[26] *See* A.R. at 5079.

'has rational support in the record.'" *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). We shall

> uphold the plan's decision as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Id.* (internal quotation marks omitted). This standard is a deferential one; we shall "overturn the administrator's decision only where there is an absence of reasoning to support it." *Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011).

**B.**

After studying the briefs, examining the record and hearing from the parties at oral argument, it is clear to us that the district court identified astutely the nub of the dispute in this litigation: The parties are essentially at odds as to whether the Plan covers the type of care that Ms. Jeranek received at Nu-Roc.[27]

---

[27] As she did before the district court, Ms. Becker raises a long list of issues, most of which we can resolve without significant discussion.

(continued...)

_____

(...continued)

Ms. Becker asserts that Humana arbitrarily and capriciously failed to designate, in advance, a length of stay for Ms. Jeranek at Nu-Roc as required by the collective bargaining agreement that, according to Ms. Becker, governs the Plan. We decline to address this claim, which Ms. Becker forfeited by failing to raise it before the district court. *See A. Bauer Mech., Inc. v. Joint Arbitration Bd. of the Plumbing Contractors' Ass'n*, 562 F.3d 784, 792 (7th Cir. 2009).

Ms. Becker also asserts that the Plan violated ERISA when Humana failed to provide certain information in an Explanation of Benefits form that it mailed to Nu-Roc. This issue, too, was not raised before the district court and therefore is forfeited. We add that the provision upon which Ms. Becker relies, 29 C.F.R. § 2560.503-1(g), requires that information be provided to *claimants*, not service providers, and that Ms. Becker has not alleged that Humana failed to provide the information to her or to Ms. Jeranek.

Ms. Becker further claims that Humana erred by using the SPD to interpret the terminal illness coverage under the Plan because, she asserts, the SPD was silent as to that benefit. This is factually inaccurate; the SPD describes the limits of coverage, including the exclusion of primarily custodial or domiciliary care to end-of-life patients. *See* A.R. at 6961-62 (SPD 24-25). Even if Ms. Becker had described accurately the SPD, her argument would be unavailing. We have held that an SPD's silence cannot be substituted for the terms of the underlying plan document. *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1023 (7th Cir. 1998).

Ms. Becker dedicates a significant amount of space in her brief to the assertion that Nu-Roc is a "skilled nursing facility"

(continued...)

In addressing this question, we begin, as we must, with the plain language of the Plan. *See Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540-41 (7th Cir. 1996). Specifically, the Plan states, in relevant part:

> A plan of treatment which does not require such skilled nursing services *and* is designed solely to assist the patient with the simple activities of daily living, or to provide the protection of an institutional environment as a convenience to the

---

(...continued)
as that term is defined in the Plan. The Plan concedes the point, but notes that Nu-Roc's designation is not at issue in this litigation. We agree.

Ms. Becker asserts that Humana failed to turn over documents relating to its initial approval of coverage for Ms. Jeranek's Phase One care at Nu-Roc. This, too, is an argument that went unraised before the district court and therefore is forfeited. We note that the Plan maintains, as it did at oral argument, that its initial approval was an error that it cannot explain, averring that it has provided Ms. Becker with "every document in its possession and every document considered in the claim and review process." Appellee's Br. 47.

Relying only on what she describes as Humana's initial approval of Ms. Jeranek's Phase One care, Ms. Becker asserts that Humana arbitrarily and capriciously changed its interpretation of Plan coverage in such a way as to deny coverage for Ms. Jeranek's Phase Two care and to deny retroactively coverage for her Phase One care. We do not believe that Ms. Becker has presented sufficient evidence of her claim that Humana changed its interpretation at any point.

patient, does not constitute a basis for covered benefits.[28]

It also states:

Covered benefits for a terminally ill enrollee whose condition becomes primarily custodial or domiciliary in nature, *and* the medical condition no longer requires continuing skilled nursing service[,] will not be payable.[29]

The Plan further states:

Covered benefits will not be payable for the following ineligible convalescent or long-term illness care:

- Enrollees who have reached the maximum level of recovery possible for their particular condition *and* who no longer require definitive treatment other than routine supportive care;

- Enrollees whose care is primary domiciliary or custodial in nature. Domiciliary or custodial care is the provision of room and board, with or without routine supportive care and training and supervision in personal hygiene and other forms of self-care, *to an enrollee who does not require definitive medical or skilled nursing services*;

---

[28] A.R. at 6122 (Plan Manual 2.89) (emphasis added).

[29] *Id.* at 6123 (Plan Manual 2.90) (emphasis added).

- Terminal care of enrolles *whose condition no longer requires definitive professional skilled nursing services; . . . .*[30]

Further, the Plan states:

> If and when an enrollee requires only boarding and physical maintenance care, *and not definitive medical or skilled nursing care service,* the enrollee will cease to be eligible for payment of covered benefits.[31]

The Plan language makes clear that care is not covered unless skilled nursing services are provided.[32] Faced with this text, Ms. Becker challenges Humana's determination that her mother did not receive skilled nursing care. Ms. Becker focuses on both the type of care and the frequency of care to make her case. Accordingly, we address each issue in turn.

**1.**

We first address whether it was arbitrary and capricious for Humana to conclude that the type of care that Ms. Jeranek received at Nu-Roc did not constitute skilled

---

[30] *Id.* at 6124 (Plan Manual 2.91) (emphasis added).

[31] *Id.* at 6126 (Plan Manual 2.93) (emphasis added).

[32] We address separately the question whether primarily custodial care is covered if *some* skilled nursing services are provided.

nursing services. The Plan defines "skilled nursing services" as:

> those which must be furnished by or under the direct supervision of professionally trained and licensed nursing personnel (under the general direction of the physician) to achieve the medically desired result, and to ensure the safety of the patient. A skilled nursing service requires specialized (professional) training; or observation and assessment of the medical needs of the patient; or supervision of a medical treatment plan involving multiple services where specialized health care knowledge must be applied in order to attain the desired medical results.[33]

Ms. Becker submits that Ms. Jeranek received skilled nursing services while at Nu-Roc. The Plan disputes this characterization and points to the independent physician reviews, each of which determined that Ms. Jeranek neither required nor received skilled nursing services. In the first independent medical review performed in this case, Dr. Wood noted that Nu-Roc provided "oral medications, sliding scale insulin with accuchecks, intermittent blood draws, minor skin care, and intermittent [physical therapy]."[34] His conclusion was that none of the care Ms. Jeranek received was skilled nursing service as that term is used in the Plan. Dr. Wood reached the same conclusions in his next review of Ms. Jeranek's

---

[33] *Id.* at 6122 (Plan Manual 2.89).

[34] *Id.* at 714.

medical records. He noted that Ms. Jeranek received "oral medications, sliding scale insulin, assistance with activities of daily living and continued monitoring in the setting of clinical stability," but again determined that these services simply did not constitute skilled nursing services.[35] He came to substantially the same conclusion the third time he reviewed Ms. Jeranek's medical records.[36] Similarly, Drs. Menkes and Zarcone concluded that Ms. Jeranek "had a chronic, stable condition not re-quiring skilled nursing [care]."[37]

---

[35] *Id.* at 1583.

[36] *Id.* at 2822.

[37] *Id.* at 3587. Drs. Wood, Menkes and Zarcone relied in part on the *Milliman Care Guidelines*, which the Plan asserts—and Ms. Becker does not deny—is a nationally recognized clinical decision support tool. The physicians' conclusions appear consistent with the *Guidelines*, which define skilled services as those that are "so inherently complex that [they] can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," including:

- Acute rehabilitation services, including **ALL** of the following:

  ○ Rehabilitation is primary reason for admis-sion[]

  . . . .

  ○ Patient can benefit from and tolerate at least 3 hours of rehabilitation services, typically a combination of modalities, at least 5 days a week[]

(continued...)

(...continued)

.  .  .  .

- Subacute or skilled facility rehabilitation services (PT, OT, and SLP), including **1 or more** of the following:

    - Rehabilitation services for patient who is too ill to participate in physical or cognitive therapy for 3 hours daily[]

    - Supportive care with low-intensity services; may be eligible later for acute rehabilitation

    - Therapy services delivered under supervision of licensed therapist at least 5 days weekly for minimum weekly total of 150 minutes

    - Nursing rehabilitation services at least 6 days weekly in at least 2 activities, AND services delivered under supervision of licensed therapist at least 3 days weekly for minimum weekly total of 45 minutes

- Parenteral nutrition: any nutritional infusion through central (TPN) or peripheral (PPN) port

- IV, epidural, or intrathecal medication . . .

- Respiratory care that includes **1 or more** of the following:

    - Ventilator care

    - Tracheostomy care

    - Nasopharyngeal or tracheal suctioning

(continued...)

Dr. Regan, who conducted the last medical review, noted that Ms. Jeranek's primary physician had indicated that, as of November 14, 2007, Ms. Jeranek was "'on comfort measures only.'"[38] After reviewing the Phase One and Phase Two records, Dr. Regan noted that "there were

---

(...continued)

        ○  Respiratory therapy (. . . provided 7 days weekly for at least 15 minutes daily[])

        ○  Oxygen therapy[]

  ● Radiation therapy

  ● Chemotherapy

  ● Dialysis . . .

  ● Transfusions of blood or blood products

  ● Treatment for pressure or stasis ulcers

        ○  At least one ulcer at stage III or stage IV

        ○  2 ulcers at any stage

  ● Surgical wound care

  ● Treatment for open lesions other than ulcers, rashes, or cuts ([e.g.], cancer lesions)

  ● Treatment for foot infection or open lesions

  ● Burn care

  ● Tube feeding . . .

*Id.* at 7188-89 (emphasis in original) (endnotes omitted) (internal quotation marks omitted).

---

[38] *Id.* at 4770.

no significant changes other than an occasional oral antibiotic or a change in the furosemide[39] dosing. . . . There [were] never any significant departures from her original plan of care or orders."[40] Although there was "an involved medication list, . . . this was largely the same list [Ms. Jeranek] was adhering to in the outpatient setting."[41] Further, Dr. Regan noted that "[t]here was no direction to the care other than maintaining [Ms. Jeranek] at a level of performance, which would translate to allowing for a maximal level of day-to-day comfort."[42] Therefore, Dr. Regan concluded that Ms. Jeranek did not receive and "did not require the [skilled nursing facility] level of service."[43]

Ms. Becker does not dispute, as a factual matter, the care and services that her mother received at Nu-Roc; she contends, however, that at least some of that care should have been characterized as skilled nursing services. Most of her submission is devoid of reference to any medical authority or of any factual detail that might call into question Humana's determination and

---

[39] Furosemide is a "water pill" used to reduce swelling and fluid retention. *See* National Institutes of Health, *Furosemide*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858. html (last updated Sept. 1, 2010).

[40] A.R. at 4770.

[41] *Id.* at 4771.

[42] *Id.*

[43] *Id.*

the physicians with whom it consulted. The single exception is her reliance on an assessment offered by Ms. Jeranek's attending physician, Dr. Rebecca Perry, whom Ms. Becker refers to as her medical expert. In a letter written on December 23, 2008—about two months after Ms. Jeranek died—Dr. Perry wrote that Ms. Jeranek "was a very complex patient and maintenance of her skin integrity, her cardiac function, her diabetic control (which included medications, diet and activities), her general mobility and pain control from her severe eye discomfort without question required the care of skilled nursing personnel."[44, 45]

As a threshold matter, we note that, under the Plan, provision of "care by skilled nursing personnel" is not the equivalent of the provision of "skilled nursing services." Ms. Becker has pointed to no language in the Plan that suggests that the mere presence of "skilled nursing personnel" equates with the provision of "skilled nursing services," and the Summary Plan Description suggests otherwise.[46] Coverage under the Plan

---

[44] *Id.* at 297.

[45] Before the district court, Ms. Becker identified entries in Ms. Jeranek's medical records that she presented as skilled nursing services. *See* R.40 at 8-9. She has made no such assertion on appeal, and thus we deem this factual argument abandoned.

[46] *See* A.R. at 6961-62 (SPD 25) (noting, in a section titled "Benefits For Treatment At A Skilled Nursing Facility," that

(continued...)

depends entirely on the *type* of care received, not the qualifications of the nursing staff providing that care.

Even if we assume that Ms. Becker's medical expert employed the phrase "the care of skilled nursing personnel" to mean the provision of "skilled nursing services," we would be faced with, at best, "a contest of competing medical opinions." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). In such cases, the deferential standard of review requires that we accept "[the administrator's] choice between competing medical opinions so long as it is rationally supported by record evidence." *Id*. Here, there is ample evidence to support the conclusion that Ms. Jeranek's care at Nu-Roc did not involve the provision of care that had to "be furnished by or under the direct supervision of professionally trained and licensed nursing personnel," services that "require[d] specialized (professional) training," "observation and assessment" of a patient's medical needs or "supervision of a medical treatment plan involving multiple services where specialized health care knowledge must be applied in order to attain the desired medical results."[47] There was more than an adequate basis for the Plan's conclusion that the care provided was entirely custodial and domiciliary in nature.

---

[46] (...continued)
"[m]any patients at skilled nursing facilities receive custodial care, for which the Plan does not provide benefits").

[47] *See id*. at 6122 (Plan Manual 2.89).

Ms. Jeranek was provided with a level of care that maintained her quality of life as much as possible, given her inexorably deteriorating condition. The quality of that care, at the hands of skilled health care providers, no doubt had a salutary impact on her life during that difficult period. However, the evidence of record permitted the reasonable conclusion that such care did not include the level of medical services that the Plan defines as skilled nursing services. Therefore, Humana's determination that Ms. Jeranek did not receive skilled nursing services, supported by the opinions of three different independent physicians who conducted a total of five reviews, was not arbitrary and capricious.[48]

---

[48] Our conclusion is limited to the question whether Ms. Jeranek's care constituted skilled nursing services as that term is defined under the Plan. By holding that it did not, we in no way intend to suggest that Ms. Jeranek received less-than-exemplary care while at Nu-Roc. Dr. Regan concluded, and neither party disputes, that Ms. Jeranek received "exceptional" care at the facility. *Id.* at 4771.

Additionally, we note that the mere existence of any number of independent physician reviews does not insulate an administrator from liability for arbitrary and capricious decisions. Our conclusion in this case is limited to the facts before us, with the physicians' reviews being one of several relevant factors.

**2.**

Ms. Becker also submits that the receipt of skilled nursing services is evidenced by Ms. Jeranek's continuing medical care during her stay at Nu-Roc. In essence, Ms. Becker contends that, if Ms. Jeranek received sufficiently frequent medical care at Nu-Roc, then that care should be considered skilled nursing services.

Central to this question is a provision of the Plan that states:

> The admitting physician, or a licensed physician designated by the admitting physician, must assume responsibility for the management of the enrollee's continuing medical care, including visits to the enrollee at such intervals as the condition may require, but *at a minimum frequency of at least once every two weeks. Less frequent visits will be regarded as evidence that the enrollee no longer requires the type of skilled nursing care covered by the program unless specific orders and progress notes indicate otherwise.*[49]

The Plan contends that the quoted language predicates coverage on *actual* doctor's visits rather than on the *average* frequency of doctor's visits. Ms. Becker concedes that Ms. Jeranek did not receive biweekly physician visits; nevertheless, she contends that the specific orders and progress notes in Ms. Jeranek's medical records substantiate that she received continuing medical care of

---

[49] *Id.* at 6125-26 (Plan Manual 2.92-93) (emphasis added).

a nature to be the equivalent of the receipt of skilled nursing services. Ms. Becker does not invite our attention to any specific change orders or progress notes. Instead, she points to the total of sixty-three change orders and asserts that every "two change orders for a complex patient [are] worth one in[-]person doctor's visit each fourteen days."[50] "Humana cannot disavow [this] conversion factor," Ms. Becker claims, because it can be found in the *Milliman Care Guidelines*.[51] Ms. Becker calculates that Ms. Jeranek received twenty-six *actual* physician visits, and—based on her sixty-three change orders—an additional thirty-one physician-visit equivalents. This equivalency computation, asserts Ms. Becker, averages out to more than one physician visit for each of the fifty fourteen-day periods during Ms. Jeranek's stay at Nu-Roc. Ms. Becker contends that this satisfied the Plan's coverage requirements.

As a threshold matter, the parties disagree about whether the Plan predicates coverage on a rate of one *actual* doctor's visit within each fourteen-day period or on an *average* of one doctor's visit per fourteen day period. The Plan language "is sufficiently ambiguous that its meaning cannot be ascertained from its plain language or from the structure of the document." *Frye v. Thompson Steel Co.*, 657 F.3d 488, 495 (7th Cir. 2011). Although our interpretation of plan language is governed by federal common law, *id.* at 493, the common law rule of

---

[50] Appellant's Br. 37.

[51] *Id.*

*contra proferentem*—that ambiguities in a contract are to be construed against the drafter—does not apply in the ERISA context when the plan authorizes a plan administrator to interpret its terms. *See Marrs v. Motorola, Inc.*, 577 F.3d 783, 787 (7th Cir. 2009). Rather, in cases such as the one before us, "[r]esolving how the terms relate to one another calls for a detailed interpretative process, and ERISA permits that process to be entrusted to" Humana as the Plan administrator. *Frye*, 657 F.3d at 495. Humana's "'use of interpretive tools to disambiguate ambiguous language is . . . entitled to deferential consideration by a reviewing court.'" *Id.* at 493 (alteration in original) (quoting *Marrs*, 577 F.3d at 786). For her argument to prevail, Ms. Becker must demonstrate that the Plan's interpretation had no "rational support in the record." *Davis*, 444 F.3d at 576 (internal quotation marks omitted). She has not met that burden.

Even accepting, for the sake of argument, that the Plan document contemplates an average number of doctor's visits, Humana certainly was not required to accept Ms. Becker's proposed conversion rate for the purpose of determining whether Ms. Jeranek received skilled nursing services. The specific provision of the *Milliman Care Guidelines* upon which Ms. Becker relies is in a portion of the text that provides instruction to medical professionals regarding the determination of "Recovery Facility Level of Care."[52] That determination requires both the "[a]bsence of acute hospital care needs" and

---

[52] A.R. at 7187-89.

one of a long list of circumstances that require inpatient treatment.[53] Included on that list is "[m]onitoring and treatment for" one or more of several conditions.[54] *Those* conditions include, among other things, "[c]linically complex situations requiring **1 or more** of the following: At least one physician visit and 4 physician order changes every 14 days [or a]t least 2 physician visits and 2 order changes every 14 days."[55]

Ms. Becker takes the particular provision dealing with physician visits and change orders out of context. Contrary to what Ms. Becker suggests, that provision does not define "[c]linically complex situations."[56] Nor does it refer to the provision of skilled nursing services. Instead, it states that *monitoring* for two types of clinically complex situations—those requiring one physician visit and four change orders every fourteen days and those requiring two physician visits and two change orders every fourteen days—may satisfy an inpatient treatment requirement necessary for determining that admission to a recovery facility is appropriate. Read in context, it is clear that the *Milliman Care Guidelines* do not support the conversion rate that Ms. Becker urges us to accept.

Notably, a separate item on the list of circumstances that require inpatient treatment—the one immediately

---

[53] *Id.* at 7188-89.

[54] *Id.* at 7189.

[55] *Id.* (emphasis in original).

[56] *Id.*

above the "[m]onitoring and treatment" provision—is the need for "skilled services so inherently complex that [they] can be safely and effectively performed only by, or under the supervision of, professional or technical personnel."[57] This resembles closely the Plan's definition of "skilled nursing services" as "those which must be furnished by or under the direct supervision of professionally trained and licensed nursing personnel (under the general direction of the physician) to achieve the medically desired result, and to ensure the safety of the patient."[58] The *Milliman Care Guidelines* provides a list of services that it considers "skilled services."[59] Tellingly, Ms. Becker has not invited our attention to anything in the record that suggests that Ms. Jeranek received any of the services listed in *this* provision of the *Guidelines*.

Aside from her proposed conversion rate and her expert's view that Ms. Jeranek was a very complex patient, Ms. Becker does not offer any other argument or evidence to support the view that Ms. Jeranek's orders or progress notes indicate continuing skilled medical care.[60] Therefore, we must conclude that the frequency of

---

[57] *Id.* at 7188-89 (internal quotation marks omitted).

[58] *Id.* at 6122 (Plan Manual 2.89).

[59] *See supra* n.37.

[60] Ms. Becker submits that the fact that Ms. Jeranek survived past her life expectancy demonstrates that her care was medically necessary, or "definitive." However, as the Plan properly points out, "the determining factor is not how long [Ms. Jeranek] lived . . ., but rather what care was actually provided to her." *See* Appellee's Br. 46.

Ms. Jeranek's care at Nu-Roc does not support the contention that she received skilled nursing care. To the contrary, under the plain terms of the Plan, the relative infrequency of medical visits and the lack of specific orders and progress notes suggest that Ms. Jeranek did not "require[] the type of skilled nursing care covered by the program."[61] Under these facts, it was not arbitrary and capricious for Humana to deny her coverage.

We further agree with the administrator that, even if Ms. Jeranek received some skilled nursing care at Nu-Roc, the decision to deny her coverage was not arbitrary and capricious. The Plan would be entitled to conclude that Ms. Jeranek would not be eligible for benefits because her care was primarily custodial, and that, to be payable, "skilled nursing care must constitute definitive treatment . . . *and* the overall care provided must not be primarily custodial."[62] Ms. Becker contends, however, that "[b]enefits are payable when there is sufficient skilled care and medical involvement *even if* overall care is 'primarily custodial[.']"[63] In short, the Plan interprets the provision of "primarily custodial care" and the provision of "skilled nursing services" to be mutually exclusive; Ms. Becker interprets these terms so that both may apply.

Here, the language of the Plan itself provides some support for both interpretations. Supporting Ms. Becker's

---

[61] A.R. at 6125-26 (Plan Manual 2.92-93).

[62] Appellee's Br. 34 (emphasis added).

[63] Appellant's Br. 28 (emphasis added).

position, for example, is a portion of the Plan dealing with coverage administration, which states, in relevant part: "If and when an enrollee requires *only* boarding and physical maintenance care, *and not* definitive medical or skilled nursing care service, the enrollee will cease to be eligible for payment of covered benefits."[64] Other provisions may be interpreted to provide additional support. For example, in its description of coverage for Skilled Nursing Facility Benefits, the Plan states that care is not covered when it "does not require . . . skilled nursing services *and* is designed solely to assist the patient with the simple activities of daily living."[65] The negative implication of this passage might be that the Plan *does* cover care that, although designed solely to assist the patient with daily living activities, requires skilled nursing services.

Supporting the Plan's interpretation is a provision in the Plan titled "Ineligible Medical Conditions," which states that services for "[e]nrollees whose care is primar[il]y domiciliary or custodial in nature" are not covered.[66] In the same paragraph, the Plan defines "domiciliary or custodial care" as "the provision of room and board, with or without routine supportive care and training and supervision in personal hygiene and other forms of self-care, to an enrollee who does not require

---

[64] A.R. at 6126 (Plan Manual 2.93) (emphasis added).

[65] *Id.* at 6122 (Plan Manual 2.89) (emphasis added).

[66] *Id.* at 6124 (Plan Manual 2.91).

definitive medical or skilled nursing services."[67] Thus, the Plan may be read to suggest that enrollees whose care *primarily* requires less than skilled nursing services are not eligible for coverage, even if they receive *some* skilled nursing services. This interpretation is bolstered by language from the Summary Plan Description, which reads, in relevant part: "Benefits will not be provided for . . . [c]are determined to be primarily custodial or domiciliary in nature (care designed to assist an individual in the activities of daily living)."[68] Additionally, the Summary Plan Description contains the following note: "Many patients at skilled nursing facilities receive custodial care, for which the Plan does not provide benefits. Custodial care may be thought of as care designed to assist an individual in the activities of daily living."[69]

The Plan language "is sufficiently ambiguous that its meaning cannot be ascertained from its plain language or from the structure of the document." *Frye*, 657 F.3d at 495. As we already have discussed, "[r]esolving how the terms relate to one another calls for a detailed interpretative process, and ERISA permits that process to be entrusted to" Humana, the Plan administrator. *Id*. Humana has the authority to "disambiguate ambiguous language" in the Plan. *Id*. at 493 (internal quotation marks omitted). Its interpretation of such language is "entitled to deferential consideration by a reviewing

---

[67] *Id*.

[68] *Id*. at 6962 (SPD 25).

[69] *Id*.

court." *Id.* (internal quotation marks omitted). Here, as before, Ms. Becker has not met her burden of demonstrating that there was no "rational support in the record" for the Plan's interpretation. *Davis*, 444 F.3d at 576 (internal quotation marks omitted). Although Ms. Becker's interpretation may be reasonable insofar as it has some support in the record, we cannot say that the Plan's interpretation, which has at least as much support, is unreasonable given our deferential standard of review. *See Marrs*, 577 F.3d at 789 ("[A] decision that is 'reasonable' rather than clearly correct is a decision that might just as well have gone the other way[] . . . .").

## Conclusion

We conclude that the Plan's decision to deny coverage for Ms. Jeranek's care at Nu-Roc because she did not receive skilled nursing services was not arbitrary and capricious. Therefore, we affirm the judgment of the district court.

AFFIRMED